J-A31042-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.R.J.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1742 EDA 2017 |

Appeal from the Order Entered May 2, 2017
in the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0001013-2016,
CP-51-DP-0003316-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: J.M.C.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1744 EDA 2017 |

Appeal from the Order Entered May 2, 2017
in the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0001014-2016,
CP-51-DP-0003317-2015

BEFORE: PANELLA, J., OLSON, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.: **FILED FEBRUARY 09, 2018**

Appellant, B.P. ("Father"), files this appeal from the orders entered May 2, 2017, in the Philadelphia County Court of Common Pleas by the Honorable Joseph Fernandes, granting the petitions of the Philadelphia Department of Human Services ("DHS") to involuntarily terminate his parental rights to his

_____

* Former Justice specially assigned to the Superior Court.

minor children, L.R.J.P., born in August of 2007, and J.M.C.P., born in December of 2011, (collectively, the "Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1] Father further appeals the orders entered May 2, 2017, changing the Children's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[2] After review, we affirm the trial court's orders.

The trial court summarized the relevant procedural and factual history, in part, as follows:

> The family in this case became known to DHS on June 8, 2014, when DHS received a Child Protective Services ("CPS") report which alleged that the Children's then sixteen-year-old brother ("Sibling 1") forced his sister ("Sibling 2") and her friend to perform oral sex on him. . . The Children, at the time, were living in a home with Mother, Father, Sibling 2, and two brothers

_____

[1] By separate orders entered the same date, the trial court involuntarily terminated the parental rights of T.T. ("Mother") with respect to the Children. Mother filed appeals at Superior Court Docket Nos. 1664 EDA 2017 and 1666 EDA 2017, which this Court consolidated. We shall address Mother's appeal in a separate decision.

[2] Father, however, failed to preserve a challenge related to the goal change by failing to raise the issue in the statement of questions involved section of his brief and by failing to present argument related thereto in his brief. As such, we find that Father has waived any claim regarding the goal change. **See Krebs v. United Refining Co. of Pennsylvania**, 893 A.2d 776, 797 (Pa.Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues); **In re W.H.**, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 24 A.3d 364 (Pa. 2011) (quoting **In re A.C.**, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

("Sibling 3" and "Sibling 4"). . . . In January 2015, DHS received a General Protective Services ("GPS") report alleging that the Children's sibling ("Sibling 5") disclosed that Father was physically abusive to Mother; that Father last abused Mother in August 2014 and Sibling 5 intervened; that Father attacked Sibling 5 when he intervened; that Father had a history of hitting the Children and their siblings; and that Sibling 5 lives with his father and spends weekends at Mother and Father's home. The report was substantiated.

On November 5, 2015, DHS visited [the home] and learned that there was no gas service in the home; that the refrigerator did not function properly; that the home was dirty; and that there was insufficient food in the home. . . . On December 18, 2015, DHS filed urgent dependency petitions for the Children, Sibling 3, and Sibling 4. On December 24, 2015, the Children were adjudicated dependent. The court ordered DHS to supervise, but cautioned parents that the [C]hildren would be placed if parents did not comply with all of the court's orders. The court ordered [Community Umbrella Agency ("CUA")] to assist with a house cleaning service and exterminator for the family; to provide beds and bedding for the family; to order a refrigerator; to conduct pop-up visits; parents to comply with safety plans and all social workers. The court also [o]rdered . . . Father to complete a [Parental Capacity Evaluation ("PCE")]; and . . . Father to be referred to the [Clinical Evaluation Unit "CEU")] for forthwith drug screens, assessments, and random screens.

At a review hearing on March 22, 2016, CUA testified that the home had been exterminated and cleaned and that the new bunk bed and refrigerator were provided. The court found that the Children, Sibling 3, and Sibling 4 were not safe in . . . Father's care, discharged supervision, and ordered all four children to be committed to DHS . . . . Father [was] granted weekly supervised visits . . . . Following phone calls with . . . Father, the Children's negative behaviors would increase. CUA testified that there were concerns during supervised visitation, as Father would inappropriately whisper things to the Children behind the cover of a newspaper. The court ordered all visitation to be supervised at the agency, line of sight and line of hearing. The court also ordered no more phone calls between the parents and the Children until further order of the court, and . . . Father [was] ordered not to contact the foster parents directly. . . .

On July 1, 2016, at a permanency review hearing, the court found . . . Father to be minimally compliant with [his] respective [Single

Case Plan ("SCP")] objectives. . . . The court ordered Father to be re-referred to [Behavioral Health Services ("BHS")] for consultation and evaluation; to be re-referred for domestic violence counseling; to be referred to Menergy; to comply with the PCE scheduled for July 19, 2016; and to comply with all services and recommendations. The court found that Father was a grave threat to the Children and suspended his visitation with the Children based on testimony regarding Father's failure to participate in the Children's trauma treatment and Father's attempt to influence the Children by saying inappropriate things to them about the case during visits. . . .

On October 26, 2016, DHS filed petitions to terminate Mother's and Father's parental rights and change the permanency goal for the Children from reunification to adoption. At the time, the Children had been in care for eight months at the start of the termination trial and fourteen months at the conclusion. The Children have been active with DHS for twenty-six months.

Trial Court Opinion ("T.C.O."), 7/25/17, at 1-3.

The trial court held hearings on the petitions on November 14, 2016, February 1, 2017, February 16, 2017, March 10, 2017, and May 2, 2017. In support thereof, DHS presented the testimony of the following: Dr. William Russell, a forensic psychologist; Jennifer Rollins, CUA case manager supervisor; Jessica Spurgeon, the Child Advocate Social Worker; and Dominique Bibbs, a CUA case manager. In addition, Father testified on his own behalf. Mother was present and testified on her own behalf as well.

Following the hearing, on May 2, 2017, the trial court entered orders involuntarily terminating the parental rights of Father pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and orders changing the Children's permanency goal to adoption. On May 31, 2017, Father, through appointed counsel, filed notices of appeal, along with concise statements of errors

complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which

this Court consolidated *sua sponte* on June 22, 2017.

On appeal, Father raises the following issues for our review:

1. Whether the [tr]ial [c]ourt erred by terminating the parental rights of [Father], under 23 Pa.C.S.A. §2511(a)(1)?

2. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Father], under 23 Pa.C.S.A. §2511(a)(2)?

3. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Father], under 23 Pa.C.S.A. §2511(a)(5)?

4. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Father], under 23 Pa.C.S.A. §2511(a)(8)?

5. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Father], under 23 Pa.C.S.A. §2511(b)?

Father's Brief at 5.

In matters involving involuntary termination of parental rights, our

standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is

free to believe all, part, or none of the evidence presented and is likewise free

to make all credibility determinations and resolve conflicts in the evidence."

***In re M.G. & J.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted).

"[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.,*** 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting ***Matter of Adoption of Charles E.D.M., II***, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc)*. Here, we analyze the court's termination order pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

In the instant matter, in finding the evidence supported grounds for termination pursuant to Section 2511(a)(2), the trial court concluded as follows:

> Father failed to take affirmative steps to place himself in a position to parent the Children. Father was unable to remedy the causes of his incapacities to meet the Children's safety, medical needs,

and their physical and emotional well-being. The Children need permanency, which Father cannot provide. Father is unable to take immediate custody of the Children. DHS met its burden under [Section] 2511(a)(2) of the Adoption Act and termination under this section was also proper.

T.C.O. at 15.

Father argues, however, that he took steps to remedy his inability to care for the Children by working on his objectives, and DHS failed to meet, by clear and convincing evidence, the test set forth in *In re: Geiger*, 459 Pa. 636, 331 A.2d 172 (1975). Father's Brief at 17. Father states that his objectives were parenting, stabilizing mental health, and housing. *Id.* at 16. Father maintains that he was in mental health treatment through Community Mental Health, completed "Healthy Relationships" domestic violence class, and completed the "Menergy" domestic violence program. *Id.* at 16-17.

A review of the record supports the trial court's determination of a basis for termination under Section 2511(a)(2). At the hearing on November 14, 2016, Dominique Bibbs, a CUA case manager, testified that Father did not have visitation with the Children at the time of the hearing because there were concerns about Father's interaction with the Children. Notes of Testimony ("N.T."), 11/14/16, at 25. Ms. Bibbs further testified Father indicated that he does not need to attend "Menergy" because he did not abuse Mother; rather he just poked her in the forehead. *Id.* at 74.

William Russell testified that, during the parenting capacity evaluation interview, Father minimized the actual sexual abuse of Sibling 2, and its

impact on the Children. N.T., 2/16/17, at 20. Dr. Russell further testified that Father projected all of the blame for the housing deficiency onto Mother. *Id.* at 22. Dr. Russell stated that Father contradicted himself during the clinical interview. *Id.* at 22. Dr. Russell supported this claim by asserting that Father stated that he was unable to provide supervision and care for the Children because of his busy work schedule, yet also claimed he coached a basketball team and helped at a soup kitchen. *Id.* at 22. Dr. Russell opined that Father is unable to provide safety and permanency to the Children. *Id.* at 23.

Jennifer Rollins testified that Father was discharged from Community Counseling for noncompliance during the period of August 2016 until November 2016. N.T., 3/10/17, at 10.

Father testified that while he is at work, Mother cares for the Children. *Id.* at 27. Father stated that his work is the primary reason for his not being home. *Id.* at 35. Father further testified that his job has been flexible with him, and that the conflict between parenting classes and Menergy precluded him from completing his parenting classes. *Id.* Father admitted that the repairs on his home have not been completed, and the furniture is still in storage. *Id.* at 36.

Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Children to be without essential parental control or subsistence necessary for their physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272.

Moreover, Father cannot or will not remedy this situation. ***See id.*** As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b). ***In re B.L.W.***, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa.Super. 2012). In ***In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]***, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

***In re T.S.M.***, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." ***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa.Super. 2010) (citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding

- 11 -

evaluation." ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted) (citing ***In re K.K.R.-S.***, 958 A.2d 529, 533 (Pa.Super. 2008))) (internal citations omitted).

In the case *sub judice*, in holding that termination of Father's parental rights favors the Children's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated:

Father's visits with the Children were suspended due to him posing a grave threat to the Children. Father was having inappropriate conversations with the Children about the case during visits. At times, Father would hide behind a newspaper to avoid the agency worker that was supervising the visit. After visits, the Children would have behavioral issues in the foster home and at school, so much so that the foster parents would have to leave work during the day to go to their school. Father's visits were therefore suspended in July 2016. The Children have not exhibited any significant behavioral issues since contact with Father stopped. Prior to the suspension of visits, Father had supervised visits at the agency, for which he was always late. Father claimed his work schedule and public transportation caused his tardiness. The

Children were always excited to see Father during visits, but did not have much time with him due to his lateness. Only [L.R.J.P.] asked to see Father since visits were suspended. [L.R.J.P.] has adjusted well since his contact with Father stopped in July 2016. Neither of the Children have suffered any irreparable harm from losing contact with Father. The Children know Father, but there is no parent-child bond. Father's relationship with the Children is very attenuated since his visits are suspended. Even when Father had visits, Father would spend little time with the Children due to his consistent lateness. Father's visits, when he had them, never progressed beyond supervised. [L.R.J.P.] indicated that he wants to go home to Mother and Father, but would be okay staying with the foster family. The Children have become numb to the situation. The Children are placed together in a safe, permanent, and pre- adoptive home. The Children appear comfortable in the foster home. [J.M.C.P.] recently had a birthday party and Sibling 2 was invited. The foster mother indicated a willingness to maintain the Children's relationship with their siblings. The foster parents meet all of the Children's needs and go above and beyond for them. The Children are treated as part of the foster family. The foster parents have a parent-child relationship with the Children. The Children have stability, structure, and discipline in the foster home and are much calmer. The foster parents also provide love, safety, and security for the Children. Both Children are receiving mental health therapy, which they attend weekly, and have been doing well. The foster parent advocates for the Children's needs. The trial court heard testimony that adoption is in the Children's best interests and that neither of them would suffer irreparable harm if Father's parental rights were terminated. [ ]DHS['] witnesses and the Child Advocate's witness were credible. Consequently, the trial court did not err or abuse its discretion when it found, by clear and convincing evidence, that there was no parental bond between Father and the Children and that termination of Father's parental rights would not destroy any existing beneficial relationship.

T.C.O. at 19-20 (internal citations omitted).

Father argues that DHS "failed to meet the clear and convincing standard under this section." Father's Brief at 19. Father notes that Ms. Bibbs testified that L.R.J.P. asks to see Father and asks about Father. *Id.* Father

highlights that he took the Children to events at the Wells Fargo Center, that he took them out for Halloween, and that he took the Children to birthday parties at Chuck E. Cheese's restaurant. *Id.* Father avers that "his sons are everything to him." *Id.*

The record likewise corroborates the trial court's termination orders pursuant to Section 2511(b). Jessica Spurgeon testified that "there is a clear parent[-]child relationship between the foster parents and the [Children]." N.T, 3/10/17, at 14. Ms. Spurgeon continued the Children are secure in their relationship with their foster mother, there is a bond, and the Children understand that foster mother is meeting their needs. *Id.* at 18. Ms. Spurgeon opined that adoption would be in the Children's best interests. *Id.* Ms. Spurgeon concluded that there would be no irreparable harm to the Children if Father's parental rights were terminated because the secure bond the Children have with the foster parents would mitigate the harm the termination would cause. *Id.* at 19-20.

Dominique Bibbs testified that adoption is the most appropriate goal for the Children. N.T., 11/14/16, at 28. Ms. Bibbs further testified that, while there is a bond between Father and the Children, the relationship is not beneficial. *Id.* at 29-30. Ms. Bibbs averred that the Children would not suffer irreparable harm if Father's parental rights were terminated. *Id.* at 31.

Jennifer Rollins testified that the Children are quite bonded with their foster mother, who they have been with since being separated from Mother

and Father. Ms. Rollins further testified that the Children know who their parents are and the Children love their parents; however, the Childreny have become numb to all of the things that they have witnessed. *Id.* at 52-53. Ms. Rollins concluded that the Children deserve stability. *Id.* at 61.

Thus, as confirmed by the record, termination of Father's parental rights serves the Children's needs and welfare. While Father may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b). We, therefore, affirm the orders of the trial court.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/9/18